UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ROBERT D. BRADY, JR. and RACHEL MEGQUIER on behalf of themselves and all others similarly situated, | ) ) ) ) |
| | Civil Action No.: 1:17-cv-1313 |
| Plaintiffs, | ) ) ) |
| v. | ) **CLASS ACTION COMPLAINT** |
| | ) **JURY TRIAL DEMANDED** |
| | ) |
| SCOTTY'S HOLDINGS LLC, DUE NORTH HOLDINGS, LLC,  and A POTS & PANS PRODUCTION, LLC, | ) ) ) |
| | ) |
| Defendants. | ) |

Plaintiffs Robert D. Brady, Jr. and Rachel Megquier, individually and on behalf of all others similarly situated, by and through counsel, bring this action against Defendants Scotty's Holdings, LLC, Due North Holdings, LLC and A Pots & Pans Production, LLC, (hereafter referred to collectively as "Scotty's" or "Defendants"), and allege as follows based upon personal knowledge, investigation of counsel, and information and belief:

**NATURE OF THE ACTION**

1.      Defendants operate a chain of 19 restaurants and breweries, known as Scotty's Brewhouse, Thr3e Wise Men Brewing Co., Scotty's Brew Club and Scotty's Dawghouse, with locations in Indiana, Illinois, Florida and Ohio.

2.      On or about January 31, 2016, Scotty's sent a letter to current and former employees advising that their 2016 W-2 tax form information had been "involved" in a data

1

breach "involving Scotty's Holdings, LLC and its subsidiary, affiliate and managed entities." [1]

3.     What Scotty's did not tell current and former employees was that their 2016 W-2 tax form information had been voluntarily given to an unauthorized third party by a Scotty's payroll account manager. Falling for a well-known "phishing" or scam email scheme which human resources and accounting professionals have been warned about, the Scotty's payroll account manager complied with an email request to send unknown cyber criminals an unencrypted data file which contained either copies of W-2 statements or all of the sensitive personally identifying information ("PII") needed to fill out a W-2, including names, mailing addresses, Social Security numbers, and wage and withholding information (the "Data Disclosure"). The compromised data contained PII for every W-2 employee[2] (as categorized by the Internal Revenue Service ("IRS")) who worked at and received wages from Scotty's during the time period of January 1, 2016 through December 31, 2016.

4.     As a consequence of the Data Disclosure, Class Members have suffered damages by taking measures to both deter and detect identity theft. Class Members have been required to take the time, which they otherwise would have dedicated to other life demands (such as work), and effort to mitigate the actual and potential impact of the Data Disclosure on their lives including, *inter alia*; placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, scheduling and attending appointments with the IRS, closely reviewing and monitoring their credit reports and accounts

---

[1] A copy of the January 31, 2017 letter (the "Notice") is attached hereto as Exhibit A.
[2] In simplest terms, the IRS has two categories for workers: employees and independent contractors. For employees, payroll taxes are automatically deducted from paychecks and paid to the government through the employer. The employer reports the wages to the IRS at the end of the year on a W-2 form. Independent contractors are responsible for calculating and submitting their own payroll taxes. Companies report the wages paid to independent contractors on a Form 1099. *See*, *IRS Publication 15-A*, *available at* https://www.irs.gov/publications/p15a/ar02.html (last visited April 14, 2017).

for unauthorized activity, and filing police reports. This time has been lost forever and cannot be recaptured.  In all manners of life in this country, time has constantly been recognized as compensable: indeed for many consumers it is the way they are compensated; and even if retired from the work force, consumers should be free of having to deal with the consequences of an employer's slippage, as is the case here.

5.      No one can know what else the cyber criminals will do with the employees' PII. However, what is known is that the Scotty's employees are now, and for the rest of their lives will be, at a heightened risk of further identity theft and fraud.

6.      For all Class Members, fear and anxiety of identity theft or fraud is the new norm.

7.      Plaintiffs bring this class action against Scotty's for failing to adequately secure and safeguard the PII of Plaintiffs and the Class, for failing to comply with industry standards regarding electronic transmission of PII, and for failing to provide accurate and adequate notice to Plaintiffs and other Class members as to precisely how their sensitive personal information had been given to unknown persons.

8.      Scotty's disregarded the rights of Plaintiffs and Class members by intentionally, willfully, recklessly, or negligently failing to take and implement adequate and reasonable measures to ensure that the data it stores was safeguarded, failing to take available steps to prevent the disclosure from happening, and failing to follow applicable, required and appropriate protocols, policies and procedures regarding the encryption of data even for internal use.  As the result, the PII of Plaintiffs and Class Members was compromised and disclosed to an unknown and unauthorized third party.  However, as this same information remains stored in Scotty's computer systems, Plaintiffs and Class members have an interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable

relief.

## PARTIES

### Plaintiff Robert Brady

9.      Plaintiff Robert D. Brady, Jr. is a citizen and resident of Punta Gorda, Florida.

10.      Plaintiff Brady began working for Scotty's Brewhouse at its Punta Gorda location on December 14, 2016.

11.      Mr. Brady is a current employee at Scotty's whose PII was disclosed without his authorization to an unknown third party as a result of the Data Disclosure.

12.      Prior to the Data Disclosure, Plaintiff Brady had no knowledge of ever being the victim of identity theft or being involved in a data breach incident.

13.      Due to the lack of information from Scotty's regarding the Data Disclosure, and the concern as to the fraudulent use of his personal information, Mr. Brady sought additional details from Human Resources, but found such information was not forthcoming.

14.      It was not until February 14, 2017, through media reports, that Mr. Brady learned that a Scotty's employee had been responsible for emailing Mr. Brady's PII to an unknown, unauthorized third party.

15.      Because his personal information was disclosed as a result of the Data Disclosure, Mr. Brady enrolled in the TransUnion credit monitoring service offered by Scotty's, yet was unable to do so until February 15, 2017 due to the unavailability of TransUnion's website in the days following receipt of the Notice from Scotty's.

16.      After receiving the Notice from Scotty's regarding the Disclosure, Mr. Brady took the recommended step of filing a Form 1039 Identity Theft Affidavit with the IRS on or about February 16, 2017.  The filing of this affidavit has delayed receipt of his 2016 tax refund. Mr.

4

Brady is required to be present in person at the Ft. Myers, Florida IRS office, with documents sufficient to prove his identity. The first available appointment with the IRS was April 21, 2017.

17.    Mr. Brady has been advised by the IRS that his tax return will be processed only after he is able to verify his identity, which will result in his expected tax refund being delayed an additional four to six weeks following this appointment.

18.    As Mr. Brady is currently out of work on unpaid medical leave, this delay in receipt of his tax refund is causing financial hardship.

19.    As a result of the Data Disclosure, Mr. Brady has spent, and will continue to spend, numerous hours monitoring his credit reports, corresponding with Scotty's HR department, corresponding with the Florida Attorney General's office and taking other actions necessary to protect himself from future incidents of identity theft or fraud.

**Plaintiff Rachel Megquier**

20.    Plaintiff Rachel Megquier is a citizen and resident of Lowell, Indiana.

21.    Ms. Megquier worked for Scotty's Brewhouse from on or about May 2016 until on or about October 2016.

22.    Ms. Megquier is a former employee of Scotty's whose PII was disclosed without her authorization to an unknown third party as a result of the Data Disclosure.

23.    Prior to the Data Disclosure, Plaintiff Megquier had no knowledge of ever being the victim of identity theft or being involved in a data breach incident.

24.    After receiving the Notice from Scotty's regarding the Data Disclosure, Ms. Megquier received a notice from the IRS that she would need to verify her identity before she can collect her tax refund for her 2016 taxes.

25.    Ms. Megquier was unable to obtain an appointment with her local IRS office until

May 8, 2017, and receipt of the refund is not expected to occur before another four to six weeks after the appointment.

26.     This significant delay in time before receiving the refund monies owed to her has caused Ms. Megquier financial hardship.

27.     Plaintiff Megquier enrolled in TransUnion credit monitoring on February 16, 2017.

28.     As a result of the Data Disclosure, Plaintiff Megquier has spent time and effort attempting to mitigate the dangers and continuing risk of identity theft and tax fraud.

**Defendants**

29.     Defendant Scotty's Holdings, LLC is an Indiana limited liability company with its principal place of business in Indianapolis, Indiana.

30.     Defendant Due North Holdings, LLC is a Delaware limited liability company with its principal place of business in Scottsdale, Arizona.

31.     Defendant A Pots & Pans Production, LLC, is an Indiana limited liability company with its principal place of business in Indianapolis, Indiana.

32.     At all times herein relevant herein, Defendant A Pots & Pans Production, LLC has been the management company for the Scotty's chain of restaurants.

33.     On or about December 2016, Defendant Due North Holdings, LLC, through one of its wholly-owned subsidiaries, acquired Scotty's Holdings, LLC and its affiliated entities.

## JURISDICTION AND VENUE

34.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act 28 U.S.C. § 1332(d) ("CAFA"), because the aggregate amount in controversy exceeds

$5,000,000, exclusive of interests and costs, there are more than 100 class members, and at least one class member is a citizen of a state different from Defendants and a citizen of a foreign state.

35.    This Court has personal jurisdiction over Defendants because the headquarters for the Scotty's restaurant chain is in this District and Defendants are authorized to and do conduct substantial business in the state of Indiana, and in this District.

36.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because the headquarters for the Scotty's restaurant chain is in this District, Defendants regularly conduct business in this District, and a substantial part of the events or omissions giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

37.    As a condition of employment, Scotty's requires that employees entrust it with certain personal information.  In its ordinary course of business, Scotty's maintains personal and tax information, including the name, address, zip code, date of birth, wage and withholding information, and Social Security number, of each current and former employee.

38.    Plaintiffs and members of the proposed Class, as current and former employers, relied on Scotty's to keep this information confidential and securely maintained.

39.    On or about January 31, 2016, Scotty's sent the Notice: a letter to current and former employees, advising that Scotty's Holdings, LLC and its subsidiary, affiliate and managed entities had been involved in a "data breach" resulting from an "email phishing scam."

40.    The letter stated that the employees' 2016 W-2 tax information, including names, addresses, social security numbers and wage information, had been involved in the breach.

41.    On or about February 6, 2017, Scotty's mailed a form letter[3] to these same employees advising that the company would be providing one year of credit monitoring services provided by TransUnion.  Employees were given until May 31, 2017 to enroll for the service.

42.    Media reports broke the news that the "data breach" was actually a voluntary disclosure of employees' PII by a Scotty's payroll manager.

43.    Defendants' payroll manager had responded to an email request for a file containing the 2016 W-2 tax information of all employees, seemingly originating from Scotty's founder Scott Wise.

44.    This Data Disclosure occurred at a time in the calendar year when W-2 information is most vital and valuable.

45.    Scotty's could have prevented this Data Disclosure.  Scotty's was not without warning of this phishing email scam, which was publicly available, yet it failed to implement adequate measures to protect its employees' PII.

46.    Scotty's negligence in safeguarding its employees' PII is exacerbated by the repeated warnings and alerts, not only of the increasing risk of general email scams, but of the actual W-2 phishing email scam it chose to ignore and, thus, fell prey to.

47.    On August 27, 2015, the Federal Bureau of Investigation ("FBI") issued a report warning of the increasingly common scam, known as Business Email Compromise, in which companies had fallen victim to phishing emails.[4] Most importantly, this report called attention to the significant spike in scams, also referred to as spoofing, in which cyber criminals send emails that appear to have initiated from the CEO or other top-level executive at the target company.

---

[3] A copy of the February 6, 2017 letter is attached hereto as Exhibit B.
[4] *See, Public Service Announcement, Business Email Compromise*, Alert No. I-082715a-PSA (August 27, 2015), *available at* https://www.ic3.gov/media/2015/150827-1.aspx (last visited December 30, 2016.).

48.    Business Email Compromise or spoofing is the forgery of an email header so that the message appears to have originated from someone or somewhere other than the actual source.  For example, spoofed email may purport to be from someone in a position of authority within a company asking for sensitive data such as passwords or employee information that can be used for a variety of criminal purposes. A telltale sign of a spoofing e-mail is an "urgent" request from a company "executive" requesting that confidential information be provided via email.

49.    As noted by cybersecurity journalist Brian Krebs, this type of fraud "usually begins with the thieves either phishing an executive and gaining access to that individual's email account or emailing employees from a look-alike domain that is one or two letters off from the company's true domain name."[5]

50.    Spoofing fraud has been steadily increasing in recent years. The FBI recently issued an alert stating that from October 2013 through February 2016, law enforcement received reports from over 17,000 victims of "spoofing" scams, which resulted in more than $2.3 billion in losses. Since January 2015, the FBI has seen a 270% increase in identified victims and exposed loss from spoofing scams.[6]

51.    Companies can mount two primary defenses to spoofing scams:  employee education and technical security barriers.  Employee education is the process of adequately making employees aware of common spoofing scams and implementing company-wide policies requiring the request or transfer of sensitive personal or financial information only through

---

[5] Brian Krebs, *FBI: $2.3 Billion Lost to CEO Email Scams*, KREBS ON SECURITY (April 7, 2016), *available at* http://krebsonsecurity.com/2016/04/fbi-2-3-billion-lost-to-ceo-email-scams/ (last visited December 31, 2016).
[6] *FBI Warns of Dramatic Increase in Business E-Mail Scams* (April 4, 2016), *available at* https://www.fbi.gov/phoenix/press-releases/2016/fbi-warns-of-dramatic-increase-in-business-email-scams (last visited December 31, 2016).

secure sources to known recipients. Employee education and secure file-transfer protocols provide the easiest method to assist employees in properly identifying fraudulent e-mails and prevent unauthorized access of personal and tax information.

52.    From a technical perspective, companies can also greatly reduce the flow of spoofing e-mails by implementing certain security measures governing e-mail transmissions. Companies can use a simple email validation system that allows domain owners to publish a list of IP addresses that are authorized to send email on their behalf to reduce the amount of spam and fraud by making it much harder for malicious senders to disguise their identities. Companies can also use email authentication that blocks email streams that have not been properly authenticated.

53.    On February 24, 2016, cybersecurity journalist Brian Krebs warned of the precise scam which snared Scotty's in a blog that said all it needed to say in its title: Phishers Spoof CEO, Request W2 Forms.[7]    Krebs warned that cybercriminals were attempting to scam companies by sending false emails, purportedly from the company's chief executive officer, to individuals in the human resources or accounting department asking for copies of W-2 data for all employees.    Krebs even provided an example of such an email that had been sent to another company:

---

[7] Brian Krebs, *Phishers Spoof CEO, Request W2 Forms*, KREBS ON SECURITY *available at* http://krebsonsecurity.com/2016/02/phishers-spoof-ceo-request-w2-forms/ (last visited December 30, 2016).



54.     Further, on March 1, 2016, the IRS issued an alert to payroll and human resources professionals warning of the same scheme.  In precise detail, the alert stated:

> The Internal Revenue Service today issued an alert to payroll and human resources professionals to beware of an emerging phishing email scheme that purports to be from company executives and requests personal information on employees.

> The IRS has learned this scheme — part of the surge in phishing emails seen this year — already has claimed several victims as payroll and human resources offices mistakenly email payroll data including Forms W-2 that contain Social Security numbers and other personally identifiable information to cybercriminals posing as company executives.

> "This is a new twist on an old scheme using the cover of the tax season and W-2 filings to try tricking people into sharing personal data. Now the criminals are focusing their schemes on company payroll departments," said IRS Commissioner John Koskinen. "If your CEO appears to be emailing you for a list of company employees, check it out before you respond. Everyone has a responsibility to remain diligent about confirming the identity of people requesting personal information about employees." [8]

55.     Again on January 25, 2017, a week before the Data Disclosure, the IRS renewed the alert specifically cautioning, "company payroll officials to double check any executive-level

---

[8] IRS, *IRS Alerts Payroll and HR Professionals to Phishing Scheme Involving W-2s*, IR-2016-34 (March 1, 2016), *available at* https://www.irs.gov/uac/Newsroom/IRS-Alerts-Payroll-and-HR-Professionals-to-Phishing-Scheme-Involving-W2s (last visited December 30, 2016).

or unusual requests for lists of Forms W-2 or Social Security number."[9]

56.    A simple phone call to verify this request would have prevented the Data Disclosure.

57.    Despite the widespread prevalence of spoofing aimed at obtaining confidential information from employers and despite the warnings of the W-2 email scam from the 2015 tax season and renewed alerts for the 2016 tax season, Scotty's provided its employees with unreasonably deficient training on cybersecurity and information transfer protocols prior to the Data Disclosure.

58.    Scotty's failed to adequately train its employees on even the most basic of cybersecurity protocols, including:

    a.    How to detect phishing and spoofing emails and other scams including providing employees examples of these scams and guidance on how to verify if emails are legitimate;

    b.    Effective password management and encryption protocols for internal and external emails;

    c.    Avoidance of responding to emails that are suspicious or from unknown sources;

    d.    Locking, encrypting and limiting access to computers and files containing sensitive information;

    e.    Implementing guidelines for maintaining and communicating sensitive data; and

    f.    Protecting sensitive employee information, including personal and financial information, by implementing protocols on how to request and respond to

---

[9] IRS, *IRS, States and Tax Industry Renew Alert about Form W-2 Scam Targeting Payroll, Human Resource Departments*, IR-2017-10 (Jan. 25, 2017), *available at*: https://www.irs.gov/uac/newsroom/irs-states-and-tax-industry-renew-alert-about-form-w2-scam-targeting-payroll-human-resource-departments (last visited April 14, 2017).

requests for the transfer of such information and how to securely send such information through a secure file transfer system to only known recipients.

59.    Scotty's failures handed criminals the PII of Plaintiffs and other Class Members and put Plaintiffs and the Class at serious, immediate and ongoing risk for identity theft and fraud.

60.    While there is a market for this PII for other long term scams, the immediate and short term practice with such breaches is that the cyber criminals will use the PII to file false tax returns.  Access to W-2 information permits identity thieves to quickly and easily file fraudulent tax returns, using the victim's information to obtain a fraudulent refund.  The IRS will direct deposit the refund to the bank account or prepaid debit card (which are virtually untraceable) provided by the thief.

61.    The Data Disclosure was caused by Scotty's violation of its obligation to abide by best practices and industry standards concerning the security of its computer and payroll processing systems.  Scotty's failed to comply with security standards and allowed its employees' PII to be compromised by failing to implement security measures that could have prevented or mitigated the Data Disclosure.  Scotty's failed to implement even the most basic of security measures to require encryption of any data file containing PII sent electronically, even internally within the company.

62.    Scotty's failed to ensure that all personnel in its human resources and payroll departments were made aware of this well-known and well-publicized phishing email scam.

63.    Upon discovery, Scotty's failed to take reasonable steps to clearly and conspicuously inform Plaintiffs and the other Class Members of the nature and extent of the Data Disclosure.  By failing to provide adequate notice, Scotty's prevented Plaintiffs and Class

13

Members from protecting themselves from the consequences of the Data Disclosure.

64.    The ramifications of Scotty's failure to keep its employees' PII secure are long lasting and severe.  Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

65.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[10] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[11]

66.    Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.

67.    The Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines. Such fraud may go undetected until debt collection calls commence months, or even years, later.[12]

68.    Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity. Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security number was used to file for unemployment benefits until law enforcement notifies the

---

[10]    17 C.F.R. § 248.201 (2013).
[11]    *Id.*
[12]    Social Security Administration, Identity Theft and Your Social Security Number, *available at* http://www.ssa.gov/pubs/EN-05-10064.pdf (last visited December 30, 2016).

individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

69.     What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security Number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

70.     Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[13]

71.     Based on the foregoing, the information compromised in the Data Disclosure is significantly more valuable than the loss of, say, credit card information in a large retailer data breach such as those that occurred at Target and Home Depot. Victims affected by those retailer breaches could avoid much of the potential future harm by cancelling credit or debit cards and obtaining replacements. The information compromised in the Scotty's Data Disclosure is difficult, if not impossible, to change—Social Security number, name, employment information, income data, etc.

72.     This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to

---

[13] *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR, Brian Naylor, Feb. 9, 2015, *available at* http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited December 31, 2016).

credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[14]

73.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police during an arrest.

74.    The fraudulent activity resulting from the Data Disclosure may not come to light for years.

75.    Despite all of the publicly available knowledge of the continued compromises of PII, and alerts regarding the actual W-2 phishing email scam perpetrated, Scotty's approach to maintaining the privacy of its employees PII was lackadaisical, cavalier, reckless, or in the very least, negligent.

76.    Scotty's has failed to provide compensation to Plaintiffs and Class Members victimized in this Data Disclosure.  Scotty's has not offered to provide any assistance or compensation for the costs and burdens – current and future – associated with the identity theft and fraud resulting from the Data Disclosure.  Scotty's has not offered employees any assistance in dealing with the IRS or state tax agencies.

77.    It is incorrect to assume that reimbursing a consumer for financial loss due to fraud makes that individual whole again.  On the contrary, after conducting a study, the U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some

---

[14] *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, Tim Greene, Feb. 6, 2015, *available at* http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited December 29, 2016).

victims."[15]

78.    To date, Scotty's has offered its employees only one year of credit monitoring service through TransUnion.   The offered TransUnion service is inadequate to protect the Plaintiffs and Class Members from the threats they face, particularly in light of the PII stolen. Websites that rank identity theft protection services are critical of the TransUnion credit monitoring service.   NextAdvisor calls the TransUnion service as "limited" in its protection and benefits.[16]  BestIDTheftCompanies.com ranks TransUnion at number 15 on its list of 34 companies with a mere score of 2.2 out of 10.[17]

79.    As a result of Scotty's failures to prevent the Data Disclosure, Plaintiffs and Class Members have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety and emotional distress.  They have suffered or are at increased risk of suffering:

    a.   The loss of the opportunity to control how their PII is used;

    b.   The diminution in value of their PII;

    c.   The compromise, publication and/or theft of their PII;

    d.   Out-of-pocket costs associated with the prevention, detection, recovery and remediation from identity theft or fraud;

    e.   Lost opportunity costs and lost wages associated with effort expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Disclosure, including but not limited to efforts spent researching how to prevent, detect, contest and recover from identity theft and

---

[15] Victims of Identity Theft, 2012 (Dec. 2013) at 10, 11, *available at* https://www.bjs.gov/content/pub/pdf/vit12.pdf (last visited April 17, 2017).

[16] *See*, http://www.nextadvisor.com/credit_report_monitoring/transunion_monitoring_review.php (last visited April 14, 2017).

[17] *See*, https://bestcompany.com/credit-monitoring/company/transunion/ (last visited April 14, 2017).

fraud;

f.   Delay in receipt of tax refund monies;

g.   Unauthorized use of compromised PII;

h.   The continued risk to their PII, which remains in the possession of Scotty's and is subject to further breaches so long as Scotty's fails to undertake appropriate measures to protect the PII in its possession; and

i.   Current and future costs in terms of time, effort and money that will be expended to prevent, detect, contest, remediate and repair the impact of the Data Disclosure for the remainder of the lives of Plaintiffs and Class Members.

## CLASS ACTION ALLEGATIONS

80.    Plaintiffs bring this suit as a class action on behalf of themselves and on behalf of all others similarly situated pursuant to Rule 23(b)(2), (b)(3) and (c)(4) of the Federal Rules of Civil Procedure.

81.    The Nationwide Class that Plaintiffs seek to represent is defined as follows:

> All current and former Scotty's employees whose PII was compromised as a result of the Data Disclosure.

82.    In the alternative to the Nationwide Class, and pursuant to Federal Rule of Civil Procedure 23(c)(5), Plaintiffs seek to represent the following state classes only in the event that the Court declines to certify the Nationwide Class above.  Specifically, the state classes consists of the following:

> All current and former Scotty's employees who currently reside in Florida and whose PII was compromised as a result of the Data Disclosure.

and

> All current and former Scotty's employees who currently reside in Indiana

and whose PII was compromised as a result of the Data Disclosure.

83. Excluded from the Class are the officers, directors and legal representatives of Scotty's and the judges and court personnel in this case and any members of their immediate families.

84. <u>Numerosity</u>. Fed. R. Civ. P. 23(a)(1). The members of the Class are so numerous that joinder of all members is impractical. While the exact number of Class members is unknown to Plaintiffs at this time, based on information and belief, it is estimated to be at or above 4,000. The exact number is generally ascertainable by appropriate discovery as Scotty's had knowledge of the employees whose PII was in the data file it disclosed.

85. <u>Commonality</u>. Fed. R. Civ. P. 23(a)(2) and (b)(3). There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

a. Whether and to what extent Scotty's had a duty to protect the PII of Class Members;

b. Whether Scotty's failed to adequately safeguard the PII of Class Members;

c. Whether Scotty's adequately, and accurately informed Class Members that their PII had been compromised;

d. Whether Scotty's failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Disclosure;

e. Whether Scotty's engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII of Class Members;

f. Whether Class Members are entitled to actual damages, statutory damages, and/or

punitive damages as a result of Scotty's wrongful conduct;

j.    Whether Plaintiffs and the members of the Class are entitled to restitution as a result of Scotty's wrongful conduct; and,

k.    Whether Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Disclosure.

86.    <u>Typicality</u>.  Fed. R. Civ. P. 23(a)(3).  Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' PII, like that of every other class member, was disclosed by Scotty's.  Plaintiffs' claims are typical of those of the other Class Members because, *inter alia*, all Members of the Class were injured through the common misconduct of Defendants. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class members, and there are no defenses that are unique to Plaintiffs.  The claims of Plaintiffs and those of other Class members arise from the same operative facts and are based on the same legal theories.

87.    <u>Adequacy of Representation</u>.  Fed. R. Civ. P. 23(a)(4).  Plaintiffs will fairly and adequately represent and protect the interests of the Class in that they have no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages they have suffered are typical of other Class members. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously.

88.    <u>Superiority of Class Action</u>.  Fed. R. Civ. P. 23(b)(3).  The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the

controversy alleged herein; it will permit a large number of class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain class members, who could not individually afford to litigate a complex claim against large corporate Scotty's. Further, even for those class members who could afford to litigate such a claim, it would still be economically impractical.

89.     The nature of this action and the nature of laws available to Plaintiffs and the Class make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and the Class for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each member of the Class to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

90.     The litigation of the claims brought herein is manageable.  Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

91.     Adequate notice can be given to Class Members directly using information maintained in Scotty's records.

92.    Unless a Class-wide injunction is issued, Scotty's may continue in its failure to properly secure the PII of Class Members, Scotty's may continue to refuse to provide proper notification to Class Members regarding the Data Disclosure, and Scotty's may continue to act unlawfully as set forth in this Complaint.

93.    Further, Defendants have acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the members of the Class as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

94.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.  Such particular issues include, but are not limited to:

   a.    Whether Defendants owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their PII;

   b.    Whether Defendants breached a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their PII;

   c.    Whether Defendants failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

   d.    Whether an implied contract existed between Defendants and the Class and the terms of that implied contract; and

   e.    Whether Defendants breached the implied contract.

## FIRST CAUSE OF ACTION
### Negligence
### (On Behalf of the Class)

95.     Plaintiffs restate and reallege paragraphs 1-94 above as if fully set forth herein.

96.     As a condition of their employment, employees were obligated to provide Scotty's with certain PII, including their date of birth, mailing addresses and Social Security numbers.

97.     Plaintiffs and the Class Members entrusted their PII to Scotty's on the premise and with the understanding that Scotty's would safeguard their information.

98.     Defendants had full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and Class Members could and would suffer if the PII were wrongfully disclosed.

99.     Defendants had a duty to exercise reasonable care in safeguarding, securing and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.  This duty includes, among other things, designing, maintaining and testing Defendants security protocols to ensure that Plaintiffs and Class members' information in its possession was adequately secured and protected and that employees tasked with maintaining such information were adequately training on cyber security measures regarding the security of employees' personal and tax information.

100.    Plaintiffs and the Class Members were the foreseeable and probable victims of any inadequate security practices and procedures.  Scotty's knew or should have known of the inherent risks in collecting and storing the PII of Plaintiffs and the Class, the critical importance of providing adequate security of that PII, the current cyber scams being perpetrated on companies, and that it had inadequate employee training and education and IT security protocols in place to secure the PII of Plaintiffs and the Class.

101.    Scotty's own conduct created a foreseeable risk of harm to Plaintiffs and Class Members.  Scotty's misconduct included, but was not limited to, its failure to take the steps and opportunities to prevent the Data Disclosure as set forth herein.  Scotty's misconduct also included its decision not to comply with industry standards for the safekeeping and encrypted authorized disclosure of the PII of Plaintiffs and Class Members.

102.    Plaintiffs and the Class Members had no ability to protect their PII that was in Scotty's possession.

103.    Scotty's was in a position to protect against the harm suffered by Plaintiffs and Class Members as a result of the Data Disclosure.

104.    Scotty's had and continues to have a duty to adequately disclose that the PII of Plaintiffs and Class Members within its possession might have been compromised, how it was compromised and precisely the types of information that were compromised and when.  Such notice was necessary to allow Plaintiffs and the Class Members to take steps to prevent, mitigate and repair any identity theft and the fraudulent use of their PII by third parties.

105.    Scotty's had a duty to have proper procedures in place to prevent the unauthorized dissemination of the PII of Plaintiffs and Class Members.

106.    Scotty's has admitted that the PII of Plaintiffs and Class Members was wrongfully disclosed to unauthorized third persons as a result of the Data Disclosure.

107.    Scotty's, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and Class Members by failing to exercise reasonable care in protecting and safeguarding the PII of Plaintiffs and Class Members during the time the PII was within Scotty's possession or control.

108.    Scotty's improperly and inadequately safeguarded the PII of Plaintiffs and Class

24

Members in deviation of standard industry rules, regulations and practices at the time of the Data Disclosure.

109.    Scotty's failed to heed industry warnings and alerts issued by the IRS to provide adequate safeguards to protect employees' PII in the face of increased risk of a current phishing email scheme being perpetrated.

110.    Scotty's, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and Class Members by failing to have appropriate procedures in place to detect and prevent dissemination of its employees' PII.

111.    Scotty's, through its actions and/or omissions, unlawfully breached its duty to adequately disclose to Plaintiffs and Class Members the existence, and scope of the Data Disclosure.

112.    But for Scotty's wrongful and negligent breach of duties owed to Plaintiffs and Class Members, the PII of Plaintiffs and Class Members would not have been compromised.

113.    There is a close causal connection between Scotty's failure to implement security measures to protect the PII of current and former employees and the harm suffered or risk of imminent harm suffered by Plaintiffs and the Class.

114.    As a result of Scotty's negligence, Plaintiffs and the Class Members have suffered and will continue to suffer damages and injury including, but not limited to: out-of-pocket expenses associated with addressing false tax returns filed; current and future out-of-pocket costs in connection with preparing and filing tax returns; loss or delay of tax refunds as a result of fraudulently filed tax returns; out-of-pocket expenses associated with procuring robust identity protection and restoration services; increased risk of future identity theft and fraud, and the costs associated therewith; and time spent monitoring, addressing and correcting the current and future

consequences of the Data Disclosure.

## SECOND CAUSE OF ACTION
### Invasion of Privacy
### (On Behalf of the Class)

115.    Plaintiffs restate and reallege paragraphs 1-94 above as if fully set forth herein.

116.    Plaintiffs and Class Members had a legitimate expectation of privacy to their PII and were entitled to the protection of this information against disclosure to unauthorized third parties.

117.    Defendants owed a duty to its employees, including Plaintiffs and Class Members, to keep their PII contained as a part thereof, confidential.

118.    Defendants intentionally released to unknown and unauthorized third parties a file containing the PII of Plaintiffs and Class Members.

119.    Defendants intentionally allowed unauthorized and unknown third parties unfettered access to and examination of the PII of Plaintiffs and Class Members.

120.    The unauthorized release to, custody of and examination by unauthorized third parties of the PII of Plaintiffs and Class Members, especially where the information includes Social Security numbers and wage information, would be highly offensive to a reasonable person.

121.    The intrusion was into a place or thing, which was private and is entitled to be private.  Plaintiffs and Class Members disclosed their PII to Scotty's as part of their employment, but privately with an intention that the PII would be kept confidential and would be protected from unauthorized disclosure.  Plaintiffs and Class Members were reasonable to believe that such information would be kept private and would not be disclosed without their authorization.

122.    The Data Disclosure at the hands of Defendants constitutes an intentional

interference with Plaintiffs and Class Members' interest in solitude or seclusion, either as to their persons or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

123.    As a proximate result of the above acts and omissions of Scotty's, the PII of Plaintiffs and Class Members was disclosed to and used by third parties without authorization, causing Plaintiffs and Class Members to suffer damages.

124.    Unless and until enjoined, and restrained by order of this Court, Scotty's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and Class Members in that the PII maintained by Scotty's can be viewed, distributed and used by unauthorized persons. Plaintiffs and Class Members have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiffs and the Class.

### THIRD CAUSE OF ACTION
### Breach of Implied Contract
### (On Behalf of the Class)

125.    Plaintiffs restate and reallege paragraphs 1-94 above as if fully set forth herein.

126.    Plaintiffs and Class members were required to provide their PII, including names, addresses, Social Security numbers, and other personal information, to Scotty's as a condition of their employment.

127.    Implicit in the employment agreement between Scotty's and its employees was the obligation that both parties would maintain information confidentially and securely.

128.    Section 5:1 of the Scotty's Employee handbook provides that conduct which violates the company's "professional conduct policy includes the disclosure of . . . confidential information regarding . . . employees."

129.    Scotty's had an implied duty of good faith to ensure that the PII of Plaintiffs and

Class members in its possession was only used to provide agreed-upon compensation and other employment benefits from Scotty's.

130.    Scotty's had an implied duty to reasonably safeguard and protect the PII of Plaintiffs and Class members from unauthorized disclosure or uses.

131.    Additionally, Scotty's implicitly promised to retain this PII only under conditions that kept such information secure and confidential.

132.    Plaintiffs and Class members fully performed their obligations under the implied contract with Scotty's. Scotty's did not.

133.    Plaintiffs and Class members would not have provided their confidential PII to Scotty's in the absence of their implied contracts with Scotty's, and would have instead retained the opportunity to control their PII for uses other than compensation and employment benefits from Defendants.

134.    Scotty's breached the implied contracts with Plaintiffs and Class members by failing to reasonably safeguard and protect Plaintiffs' and Class members' PII, which was compromised as a result of the Data Disclosure.

135.    Scotty's acts and omissions have materially affected the intended purpose of the implied contacts requiring Plaintiffs and Class members to provide their PII as a condition of employment in exchange for compensation and benefits.

136.    As a direct and proximate result of Scotty's breach of its implied contacts with Plaintiffs and Class members, Plaintiffs and Class members have suffered and will suffer injury, including but not limited to: (i) the loss of the opportunity how their PII is used; (ii) the compromise, publication, and/or theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of

their PII; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Disclosure, including but not limited to efforts spent researching how to prevent, detect, contest and recover from tax fraud and identity theft; (v) costs associated with placing freezes on credit reports; (vi) the continued risk to their PII, which remain in Scotty's possession and is subject to further unauthorized disclosures so long as Scotty's fails to undertake appropriate and adequate measures to protect the PII of employees and former employees in its continued possession; and, (vii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Disclosure for the remainder of the lives of Plaintiffs and Class members.

**FOURTH CAUSE OF ACTION**
**Breach of Fiduciary Duty**
**(On Behalf of the Class)**

137.    Plaintiffs restate and reallege paragraphs 1-94 above as if fully set forth herein.

138.    Scotty's was a fiduciary, as an employer created by its undertaking, to act primarily for the benefit of its employees, including Plaintiffs and Class members, for the safeguarding of employees' PII and wage information.

139.    Scotty's had a fiduciary duty to act for the benefit of Plaintiffs and Class members upon matters within the scope of their employer/employee relationship, in particular to keep secure income records and the PII of its employees.

140.    Scotty's breached its duty of care to Plaintiffs and Class members to ensure that their PII and W-2 data was not disclosed without authorization or used for improper purposes by failing to provide adequate protections to the information and by voluntarily disclosing the information, in an unencrypted format, to an unknown and unauthorized third party.

141.    As a direct and proximate result of the Scotty's actions alleged above, the Plaintiffs and Class members have suffered actual damages.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs on behalf of themselves and all others similarly situated, pray for relief as follows:

A.    For an Order certifying this action as a class action and appointing Plaintiffs and their Counsel to represent the Class;

B.    A mandatory injunction directing Scotty's to hereinafter adequately safeguard the PII of the Class by implementing improved security procedures and measures;

C.    A mandatory injunction requiring that Scotty's provide notice to each member of the Class relating to the full nature and extent of the Data Disclosure and the disclosure of PII to unauthorized persons;

D.    For an award of damages, in an amount to be determined;

E.    For an award of attorneys' fees and costs; and

G.    Such other and further relief as this court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: April 26, 2017                    Respectfully submitted,

                                         /s/ Lynn A. Toops
_____

                                         Irwin B. Levin, #8786-49
                                         ilevin@cohenandmalad.com
                                         Richard E. Shevitz, #12007-49
                                         rshevitz@cohenandmalad.com

Lynn A. Toops, #26386-49A
ltoops@cohenandmalad.com
COHEN & MALAD, LLP
One Indiana Square, Ste. 1400
Indianapolis, IN 46204
Telephone:  (317) 636-6481
Facsimile: (317) 636-2495

JOHN A. YANCHUNIS*
jyanchunis@ForThePeople.com
MARISA GLASSMAN*
mglassman@ForThePeople.com
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Telephone: (813) 223-5505
Facsimile: (813) 223-5402

PAUL C. WHALEN *
paul@paulwhalen.com
LAW OFFICE OF PAUL C. WHALEN, P.C.
768 Plandome Road
Manhasset, NY  11030
Telephone: (516) 426-6870
Facsimile:   (212) 658-9685

JEAN SUTTON MARTIN*
jean@jsmlawoffice.com
LAW OFFICE OF JEAN SUTTON
MARTIN PLLC
2018 Eastwood Road Suite 225
Wilmington, NC 28403
Telephone: (910) 292-6676
Facsimile: (888) 316-3489

JASPER D. WARD IV*
jasper@jonesward.com
ALEX C. DAVIS
alex@jonesward.com
JONES WARD PLC
312 S. Fourth Street
Louisville, KY 40202
Telephone: (502) 882-6000
Facsimile: (502) 587-2007

BRIAN P. MURRAY*
bmurray@glancylaw.com
GLANCY PRONGAY & MURRAY LLP
122 East 42nd Street, Suite 2920
New York, NY 10168
Telephone: (212) 682-5340

DENNIS L. WEBB*
dennis@swflalawyers.com
LAW OFFICES OF DENNIS L. WEBB, P.A.
2080 McGregor Blvd. Suite 200
Fort Myers, FL  33901
Telephone: (239) 334-1600
Facsimile: (239) 334-7979

*Attorneys for Plaintiffs and the Proposed Class*

*\* pro hac vice* application to be submitted